**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.  15-CV-02015-REB-NYW**

JOHN HAYES,

      Plaintiff,

v.

SKYWEST AIRLINES INC,

      Defendant.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

Through his attorney Paul Maxon, Plaintiff John Hayes submits this brief in opposition to Defendant's Motion for Summary Judgment.

**I.**    **PLAINTIFF'S STATEMENT OF FACTS**

1.  From 2006 until 2014 John Hayes was an excellent employee for Defendant Skywest.  In his performance reviews, his supervisors described him as an "exemplary model" for his co-workers, who had a "strong connection to his fellow peers." (Ex.1)[1].  One supervisor stated "on a day to day basis [Mr. Hayes] exemplifies the role model, mentor and guiding principles of SkyWest." (Ex. 2).

---

[1] Please note that exhibit numbers refer to the numbers on the exhibit cover pages submitted with this motion, not the deposition exhibit stickers.

2.  Consistent with these glowing reviews, Defendant promoted Mr. Hayes three different times, and featured his picture on its promotional materials. Most recently, in 2013 Defendant promoted him to shift manager. (Exhibits. 3, 4).

3.  Unfortunately, Mr. Hayes has kidney disease, technically referred to as "end stage renal disease as a result of polycystic kidney disease." In order to stay alive, he is required to undergo daily dialysis. (Ex. 5, p.2).

4.  On December 11, 2013, due to deteriorating health, Mr. Hayes voluntarily resigned his nighttime shift manager position. (Ex. 6). In January 2014, he returned to a Certified Station Trainer ("CST") position that he had held previously. (Ex. 7 at 81:10-83:1).

5.  In June 2014, Mr. Hayes' condition deteriorated, requiring surgery to insert a catheter to facilitate dialysis. (Ex. 5). He told Defendant about this change in his health and began medical leave on June 17. *Id.*

6.  On July 2, Mr. Hayes had surgery to repair a hernia and insert a dialysis catheter. (Ex. 5). Four weeks later, while Mr. Hayes was still on FMLA leave and recovering from surgery (see Resp. to Def. Fact No. 16, *infra*), he and his wife were at his doctor's office for treatment.  During his visit, he was informed by the center's staff that Defendant, in violation of its own written policy, cancelled his health insurance. (Ex. 7 at 128:21-132:5; Ex. 8 at 2a).

7.  On August 11, 2014, Mr. Hayes' physician cleared him to return to work with a 30 pound lifting restriction. (Ex. 9). The next day, Mr. Hayes submitted to SkyWest an

accommodation request that he work exclusively as a trainer, so that he could comply with his doctor ordered lifting restrictions.  (Ex. 10).

8. After engaging in the ADA'S interactive process, employee development manager Kiana Jodell signed Mr. Hayes' accommodation request and  approved his return to work as a CST with a 30 pound lifting restriction. (*Id.*; Ex. 11 at 80:18-81:11; Ex. 7 at 19:10-12). Her approval was consistent with Defendant's CST position description, which did not list lifting as a requirement. (Ex. 12).

9. On August 12, with the approval of <u>three</u> of Defendant's managers, Mr. Hayes returned to work as a CST. (Ex. 7 at 145:24-146:12; Exhibits 13, 14, 15). Per his supervisor-approved accommodation request, his work involved exclusively training, with no heavy lifting. (Exhibits 16, 11 at 72:23-73:22).

10. After he returned to work as a trainer with a lifting restriction, Mr. Hayes performed his job without incident, and without creating any problems for Defendant. (Ex. 11 at 107:9-12). At no time after his return to work (or at any other time he worked as a CST) did he have to lift anything in violation of his doctor-imposed lifting restrictions. (Ex. 7 at 200:24-202:10).

11. On August 15, 2014, after Mr. Hayes' incident-free return to work, Defendant's Lead Leave Administrator, Andrea Roberts, reviewed Mr. Hayes' accommodation with Ms. Jodell via email. (Ex. 16). In reviewing his accommodation, Ms. Roberts determined that either Mr. Hayes' job code had to be changed to reflect the fact that he was only doing training, or he had to be placed on medical leave. (*Id.*; Ex. 11 at 74:11-75:2).

12. As a human resources professional, Ms. Roberts understood that, in order to comply with the ADA's interactive process, the employer must discuss accommodations with an employee, and it cannot simply choose an accommodation without employee input. (Ex. 11 at 28:1-29:5); *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.,* 180 F.3d 1154, 1171-72 (C.A.10 (Kan.),1999).

13. Nevertheless, on August 15, Ms. Roberts decided, without speaking to Mr. Hayes, or awareness of "what the situation [was]," that instead of modifying his job description, she would instead rescind his already approved accommodation and place him on involuntarily medical leave. (Exhibits 11 at 83:15-85:5; 16; 7 at 56:8-12). Prior to taking this action, she plotted to deceive Mr. Hayes about her intentions, stating that she was going to call him the following week and "…let him come to the conclusion or agree that a leave is best for him. This way he won't feel like he was forced on leave." (Ex. 16).

14. Ms. Roberts decided to rescind Mr. Hayes' accommodation despite not knowing what his work situation was, or being aware of any instance when he had to lift more than 30 pounds to perform his job. (Ex. 16; Ex. 11 at 95:4-20). Nor was she aware of any problems caused by his working with the lifting restriction. (Ex. 11 at 107:9-12). By her own admission, her decision to rescind his accommodation was made in the absence of any knowledge of financial hardship for Defendant, or any threat to employee safety, or of any violation of Defendant's policies. (*Id.* at 107:9-109:1).  In short, Ms. Roberts was unaware of any hardship that would have been

created by allowing Mr. Hayes to continue to work as a trainer with a lifting restriction. *Id.*

15. On August 20, consistent with her scheme to remove Mr. Hayes from his job and force him to take leave, Ms. Roberts held a conference call with Mr. Hayes. (Ex. 17). During that call, Ms. Roberts told him that Defendant would no longer honor the accommodation that it had agreed to only one week prior, and that he would be forced on medical leave. (Exhibits 17; 14). Although she had previously acknowledged that, instead of placing him on leave his job code could have been changed, she did not discuss that alternative—or any other—with him. (Exhibit 11 at 95:4-8; 14).

16. During the August 20 call, Ms. Roberts also told Mr. Hayes that he was not a CST, but a ramp agent who was required to lift bags. She made this claim despite the fact that his accommodation request (signed by Ms. Jodell) described him as a CST, and despite the fact that he was working in the training department and his job duties only involved training—with no lifting required. (Exhibits 7 at 145:24-146:12, 200:24-202:10; 11 at 73:1-9; 10; 15).

17. In response, Mr. Hayes informed Ms. Roberts that he would like a transfer to a different position.  (Ex. 18). Within hours of finishing the call, he applied for an open pilot recruiter position in Denver, and informed Ms. Roberts that he had done so. (Exhibits 19, 14). She responded that she would "reach out to the hiring department" to assist him with his application. (Ex. 14).

18. As Defendant's lead leave administrator, Ms. Roberts was one of two people with the authority to reassign Mr. Hayes to the Denver pilot recruiter position. (Ex. 11 at 9:2-7, 13:23-14:13). She understood him to be qualified for the position. (*Id.* at 111:9-19; 113:21-114:7).

19. Because Mr. Hayes was qualified to be a recruiter, under Defendant's policies he should have been placed in the position regardless of whether there was a more qualified applicant, or regardless of whether it was a promotion. (*Id.* at 18:17-19:15. Additionally, Ms. Roberts believed that she was required by the ADA to recommend Mr. Hayes for the pilot recruiter position. (*Id.* at 159:13-160:20).

20. Despite these understandings and policies, Ms. Roberts took no action to place Mr. Hayes in the pilot recruiter position. (*Id.* at 112:1-7; 113:21-114:7; 116:8-11; 156:24-157:7). Nor for the next two weeks after the August 20 phone call, did anyone from Defendant's human resources department respond to his request for reassignment. (Ex. 20).  When it did finally respond, Defendant foreclosed the possibility of any accommodation by telling him that he would not be allowed to return to work unless he had no medical restrictions. (Ex. 21).

21. Ms. Roberts claimed that she provided no help to Mr. Hayes' effort to be reassigned to the pilot recruiter position because he did not notify her that he had applied. (Ex. 11 at 156:24-157:7; 159:20-160:3). However, her written promise to assist him in obtaining the position clearly demonstrates otherwise. (Ex 14).

22. Besides Ms. Roberts, Defendant's Human Resources Manager Pennie Hancock, was the only other person with authority to place Mr. Hayes in the pilot recruiter

position. (Ex. 11 at 13:18-13). As someone with that authority, she believed she had an obligation to facilitate his reassignment as a pilot recruiter in Denver. (Ex. 22 at 60:22-61:3;159:21- 160:4; 216:4-8). However, despite her understanding of her obligations to facilitate his reassignment, she too provided him no assistance. (*Id.* at 59:15-20).

23. Like Ms. Roberts, Ms. Hancock also claimed she did not assist him in being reassigned to the pilot recruiter position allegedly because Mr. Hayes never notified her that he was seeking that position, and she was not "in the loop." (*Id.* at 59:15-20; 158:13-18).

24. However, on August 22, 2016 Mr. Hayes wrote to her "I have recently applied for the Pilot Recruiter position with SkyWest and any assistance you can provide on that front would be appreciated." (Ex. 23, p.2). In response to that email, Ms. Hancock wrote, "I have been involved with discussions…pertaining to John's responsibilities." (*Id.* at p. 1).

25. Further demonstrating that Ms. Hancock was aware of Mr. Hayes' situation and need for reassignment, on August 25 she had an email exchange where she specifically discussed him and seemed to make light of his reassignment request. (Q: "Perfect, do we still need to talk about John Hayes?" A: "Yep." Q: "Yep?" A: "You know what yep means…Tee hee."). (Ex. 24).

26. In violation of both company policy and what it understood its obligations under the ADA to be, Defendant selected another applicant, Jason Cordova, for the Denver pilot recruiter position. Defendant claimed that Mr. Cordova was selected because

he was a "more experienced applicant." (Exhibits 25, 26 at p.6). However, at the time he was selected, Mr. Cordova had been working for Defendant for one year, compared to 8 years for Mr. Hayes. (Exhibits 27, 3). Additionally, Mr. Hayes had 8 years of recruiting experience prior to working for Defendant, Mr. Cordova had none. *Id.*

27. In addition to the Denver pilot recruiter position, from August 20 to October 29, 2014, Mr. Hayes applied for transfer to five other positions with Defendant. (Ex. 28). These positions included: a parts supervisor position in Colorado Springs—a job nearly identical to one that he had held for another employer; and a shift manager position in Colorado Springs—a job that he had held for Defendant. (Exhibits, 29, 30, 31, 7 at 97:11-23).

28. Because he had performed the job previously, Mr. Hayes was qualified for the shift manager position. Further, the position was open when he applied. (Ex. 11 at 99:7-20; 100:20-101:3). Because of these facts, Ms. Roberts believed that Defendant had an obligation under the ADA to place him into the position, but neither she nor Ms. Hancock provided him any assistance in that regard. (*Id.* at 101:4-15; 102:1-5; 137:9-12; Ex. 22 at 224:8-11). Her failure to provide him with any assistance occurred even though he specifically informed her that he was seeking the position. (Ex. 32). Moreover, Defendant's failure to place him in the shift manger position was not due to any company policy, threat to health or safety, or any difficulty or expense. (Ex. 11 at 138:3-20). Although Defendant claims that the position was postponed, this did not happen until January 15, 2016, two and a half months after

Mr. Hayes applied. (Ex. 33). Defendant eventually did fill the position, but when it did so, it took no steps to place Mr. Hayes in it. (Ex. 22 at 228:18-229:8).

29. Mr. Hayes was also qualified for the parts supervisor position he applied for, as he had performed a substantially similar job for another employer. (Ex. 7 at 97:11-23). However, for this position too, Defendant provided him no assistance in securing the job, even though he specifically contacted Ms. Roberts to inform her that he was seeking it. (Exhibits 32; 11 at 143:24-144:2; 22 at 229:25-230:8). Defendant's internal documentation states that he was not selected allegedly because there was a more qualified candidate with more experience. (Ex. 34). However, after litigation began, Defendant changed its justification and claimed that he could not have performed the job because of his lifting restriction. (Ex. 11 at 142:23-143:5). But neither Defendant's written job description nor its application lists lifting as a job requirement. (Exhibits 35, 31). Nor can Defendant state how much applicants for the position have to lift. (Ex. 11 at 143:1-5).

30. Defendant's failure to reassign Mr. Hayes to these open positions for which he was qualified was contemporaneous with its learning that he had filed an EEOC charge. Defendant learned of his filing on September 16, 2014. (Ex. 36). By October 10, approximately three weeks later, it had  decided not to put him in the Denver pilot recruiter position. (Ex. 37). And by the end of that month, it had also failed to place him in the open parts supervisor and shift manager positions. (Ex. 34).

## II.   PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1. Admit.

2.  Admit.

3.  Admit.

4.  Admit.

5.  Admit.

6.  Admit.

7.  Admit.

8.  Admit.

9.  Admit.

10. Admit.

11. Deny. In Mr. Hayes' resignation letter he specifically stated that he was resigning due to "medical restrictions." (Ex. 6). During Mr. Hayes' testimony he stated that he had no "*immediate* restrictions," but that was in the context of his testimony that his deteriorating health prevented him from continuing in the manager position. (Ex. 7 at 77:8-79:6).

12. Admit.

13. Admit.

14. Deny. Mr. Hayes testified that he was told by Neil Albus, Defendant's Denver Ramp Manager, that he was being returned to the training department as a CST trainer, and that three other of Defendant's supervisors agreed to this designation. (Exhibits 7 at 76:12-17, 81:10-83:1, 146:3-16; 15; 24). One of these supervisors told Defendant's human resources representative that "all Mr. Hayes did was training." (Ex. 7 at 71:4-73:22). That same supervisor signed Mr. Hayes' accommodation

request stating that he was a "Certified Station Trainer," not a ramp agent. (Exhibits 7 at 154:3-23; 10). His security badge identified him as a CST. (Ex. 7 at 58:24-59:13). Consistent with this, Mr. Hayes testified that his work involved training new hires, and that his schedule was that of a trainer. He further testified that he was not a ramp agent but a CST. (Ex. 7 at 81:10-82:11; 146:3-1).

15. Deny. Incorporate by reference the previous response. Additionally, Mr. Hayes' last performance review listed him as a CST, and his supervisor viewed him as a CST. (Exhibits 1; 22 at 197:14-19). Mr. Hayes was also given a CST job description by Defendant. (Ex. 12).

16. Deny that he exhausted his FMLA leave. The FMLA allows for 12 weeks of leave per year and requires employers to keep detailed records of the leave used by an employee. 29U.S.C. §§ 2612(a)(1), 2616(b); 29 C.F.R. § 825.500(a-d). However, rather than cite those records, Defendant has relied on a letter it sent to Mr. Hayes in July, in which it asserted, without any accounting, that his 12 weeks was exhausted as of June 30. (Def. Dep. Ex. 45). But Defendant's records show that he had not used his 12 weeks. In addition to leave from June 23-August 12 (7 weeks, 1 day) (Ex. 14), Mr. Hayes had taken under two weeks leave (9.33 work days), in the previous year. (Ex. 38). Thus Mr. Hayes had used approximately 9 weeks of FMLA leave when he returned to work on August 12, 2014, and his 12 weeks were not exhausted. Otherwise, admit.

17. Admit in part as incomplete, incorporating by reference our response to facts Nos. 14 and 15. As discussed in those responses, several of Mr. Hayes' supervisors—not just his wife—understood him to be a CST.

18. Admit.

19. Admit.

20. Deny. The announcement that the contract was cancelled is dated September 17, 2014. (Ex. 39). Otherwise admit.

21. Admit.

22. Admit.

23. Admit.

24. Deny that Plaintiff was a ramp agent, incorporating by reference responses to Defendant fact nos. 14 and 15, specifically emphasizing his supervisor's statement that that "all Mr. Hayes did was training." (Ex. 7 at 71:4-73:22). Further deny that Mr. Hayes could not have functioned as a ramp agent. After engaging in the interactive process, Mr. Hayes' supervisor determined that he could perform his job, even with his lifting restriction. (Exhibits 7 at 19:10-12; 11 at 80:18-81:11). Specifically, he could have worked as a ramp agent by doing numerous other tasks, including lavatory service, commissary provisioning, distributing equipment, and aircraft pushback. (Ex. 7 at 159:15-161:4).

25. Admit.

26. Admit.

27. Admit.

28. Deny that Defendant "granted" Mr. Hayes leave incorporating by reference Plaintiff's Fact nos. 15, 16, and 17. As discussed there, Defendant placed him on leave against his will, as part of a scheme to intentionally deny him his right to accommodation. (Exhibits 16; 7 at 56:8-12). Ms. Roberts testified that she understood that placing him on leave was not a reasonable accommodation. (Ex. 11 at 82:15-85:5).

29. Deny. Ms. Roberts' contemporaneous correspondence does not indicate that her decision was tied to Defendant's need for training. (Ex. 16). Nor does the testimony cited by Defendant state this. Moreover, Defendant's claim is contrary to the chronology of events. Defendant states that as of *September 30*, training ended. (Def. Fact No. 23). But Ms. Roberts forced Mr. Hayes on leave on *August 20*, more than a month before. (Ex. 17). She testified that she learned that United had cancelled its contract with Defendant at the same time as all other employees, which was on September 17, (Exhibits 11 at 48:18-21; 39). This was almost one month after she rescinded the accommodation. (Ex. 17). Thus, when she rescinded the accommodation, she did not yet know that United had cancelled her contract, and her action could not have been motivated by Defendant's lack of need for trainers— which did not occur until the following month.

30. Deny. Nothing in this exhibit, an email between Ms. Roberts and one Jamie Sorensen, states that a recruiter was working with Mr. Hayes. Mr. Hayes testified that he did not even know who Ms. Sorensen was. (Ex. 7 at 165:3-11). Moreover, Defendant's exhibit only specifically mentions *one* job, the pilot recruiter position; as

discussed earlier (Pl. Fact No. 26), Defendant passed Mr. Hayes over for that position in favor of a less qualified candidate. (Exhibits 27, 3).

31. Admit in part, deny in part. Deny that the pilot recruiter position was a promotion. Ms. Hancock testified that she could not say that a move to a pilot recruiter was a promotion (Ex. 22 at 221:4-10). Additionally, Mr. Hayes admitted that his statement that pilot recruiter was a "step up," was not based on any information received from Defendant, and that he would refer to Ms. Hancock's judgment on that question. (Ex. 7 at 202:20-204:18). Otherwise, admit.

32. Admit that Mr. Hayes had not recruited pilots, but that he had previously worked as a recruiter for eight years. (Ex. 3 at p.1090).

33. Deny. First, according to Defendant's own documentation, Mr. Hayes is not arrogant. In his 2012 performance review Defendant stated that he was "admired" by co-workers with a "strong connection with his fellow peers…stemming from respect both to him and from him." Defendant further described him as a "mentor" who is "professional and diplomatic in his approach." (Ex. 1, p.1). Additionally, Defendant did not mention—either in its EEOC position statement or in its internal documentation—"arrogance" as a reason for rejecting Mr. Hayes for the position. (Exhibits 40, 25). Second, deny that Mr. Cordova was "more experienced" than Mr. Hayes, incorporating by reference our response to Plaintiff Fact No. 26, establishing that Mr. Cordova had less experience both with Defendant and as a recruiter.

34. Deny. (Ex. 7 at 100:20-101:1; 103:25-105:14).

35. Deny. *Id.*

36. Admit in part, deny in part. Admit that he applied for those positions. Deny that the shift manager position was not filled. Ms. Hancock testified that the shift manager position was filled, and when it was filled Defendant took no action to place Mr. Hayes in it. (Ex. 22 at 228:18-229:8). Further, the shift manager position was not postponed until January 15, 2015—meaning that it was open for two and a half months after Mr. Hayes applied, but during that time it was open Defendant did nothing to place him in the position. (Exhibits 33; 7 at 101:4-15, 102:1-5, 137:9-12; 22 at 224:8-11).

37. Admit.

38. Admit.

39. Admit in part, deny in part. Admit that he applied for the position. Deny that it was a promotion, as no evidence cited by Defendant establishes that, and Ms. Roberts could not say that it was. (Ex. 11 at 144:3-7). Further deny that the position had a lifting requirement, as none is listed on Defendant's job description. (Ex. 35). Further, Defendant's own documentation does not list a lifting restriction as the reason Mr. Hayes was not selected. (Ex. 34).

40. Deny. Incorporate by reference Plaintiff fact nos. 11-33 establishing that, in addition to the CST position, Defendant had open pilot recruiter, parts supervisor, and shift manager positions that he was qualified for.

41. Admit the position was terminated, deny that he was a ramp agent, incorporating by reference our response to Defendant fact nos. 14 and 15.

42. Admit.

43. Admit in part, deny in part as incomplete. Admit that Mr. Hayes was entitled to priority reinstatement based on seniority. However, despite this right, Defendant provided him no assistance in this process. (Ex. 11 at 139:12-23).

44. Deny. Mr. Hayes applied to two other positions in Colorado Springs and discussed the possibility of one in Salt Lake City. He also specifically asked Ms. Roberts if there was "any other position" that he could be moved into, but she provided him no assistance in that process. (Exhibits. 28; 7 at 96:7-12, 101:17-105:14, 204:19-22; 11 at 139:4-23).

### III.   DEFENDANT VIOLATED THE ADA BY FAILING TO ACCOMMODATE MR. HAYES.

A.   The ADA's Prima Facie Case and Burden Shifting Framework.

A prima facie ADA case involves i) a disability, ii) qualification to perform the essential functions of a position either with or without reasonable accommodation, and iii) adverse action taken because of a disability. *White v. York Intern. Corp.,* 45 F.3d 357, 360-61 (C.A.10,1995). Once an employee establishes a *prima facie* case, the burden shifts to the employer to articulate a reason why it could not accommodate. *Id.* The employee is then entitled to proceed by producing evidence demonstrating that he could have been accommodated. *Id.*

Defendant seems to concede that Mr. Hayes is disabled, and as a matter of law he is. *Arroyo-Ruiz v. Triple-S Management Group*, ---F.Supp.3d--- 2016 WL 4734351, at *6 (D.Puerto Rico, 2016). Thus the first element of the prima facie case is established, and we move to discussing whether Mr. Hayes was qualified and could have been accommodated.

B. Mr. Hayes was Qualified for Several Positions Both With and Without Accommodation.

Mr. Hayes was qualified to perform the essential functions of a parts supervisor, shift manager, CST, and, with accommodation, ramp agent. Under the ADA, as a reasonable accommodation, Defendant was required to place him in any of these open positions that were not promotions, and to not discriminate against him in his application for any positions that were. *Smith v. Midland Brake, Inc*., 180 F.3d 1154, 1161-62 (10th Cir. 1999).

*1. Mr. Hayes was Qualified for the Parts Supervisor Position*

a. Lifting was not an Essential Function

Mr. Hayes was qualified to perform the role of parts supervisor. He had worked as an aircraft parts clerk for another employer previously (Ex. 7 at 97:11-23), and Defendant has not pointed to any portion of its written position description that he could not perform. Although Defendant's position description does not list lifting as a requirement (Ex. 35), Defendant now claims that lifting was "essential," and that this was the reason it did not place him in the position.

Determination of what constitutes an essential function involves consideration of several factors, including the consequences of not requiring the employee to perform the function and the amount of time spent on the function. 29 C.F.R. 1630.2(n)(3)(iii-iv). To claim that a function is essential, employers are typically required to produce a written position description that lists the function as essential. *See* 29 C.F.R. 1630.2(n)(3)(ii); *Davidson v. America Online, Inc*., 337 F.3d 1179, 1191 (C.A.10 (Utah),2003).

The only evidence that Defendant cites to support its claim that lifting was essential for the parts supervisor position is an undocumented conclusory assertion made by Ms. Roberts during deposition. (Def. Fact No. 39). However, despite making the claim that lifting was "essential," she could not state how much parts supervisors were required to lift, and did not articulate what consequences Defendant would face if a parts supervisor could not lift more than 30 pounds, or how much time they spent lifting. (Ex. 11 at 142:19-143:23). Nor has Defendant identified any documentation delineating the scope of this allegedly "essential" function. The documentation that is available—Defendant's own position description—describes the job in strictly managerial terms, requiring the applicant to "provide direction, guidance and motivation." No strenuous physical activities are listed. (Ex. 35). As a matter of law, Defendant has not established that lifting was essential to the parts supervisor position 29 C.F.R. 1630.2(n)(3); *Davidson*, 337 F.3d at 1191.

At most, Ms. Robert's testimony establishes not that lifting was "essential" as defined by the ADA, *see* 29 C.F.R. 1630.2(n), but that there was lifting involved in the parts supervisor position. Even with this charitable reading of her testimony, however, the burden falls on Defendant to then demonstrate that placing Mr. Hayes in that position would have constituted an "undue hardship" involving "significant difficulty or expense." 42 U.S.C.A. §§ 12112(b)(5)(A); 12111. Defendant has failed to identify any such evidence establishing this.

Because lifting was not an essential function of the parts supervisor position, and Mr. Hayes was qualified for it, Defendant violated the ADA by failing to reassign him to the position. *Smith*, 180 F. 3d 1154.

> b. Defendant's Choice of Another Applicant for the Parts Supervisor Position Violated the ADA.

In addition to being inconsistent with its written job description, Defendant's claim that Mr. Hayes was not assigned to the parts supervisor position because of a lifting requirement is contrary to its own written records. Although Mr. Hayes listed his lifting restriction on the job application (Ex. 31 at p.001122), the hiring manager's notes state that Mr. Hayes was not selected for the position, not because of an inability to lift, but because Defendant preferred another, more experienced, applicant. (Ex. 34).

Defendant's choice of another preferred applicant for the parts supervisor position violated the ADA in two ways. First, an employer may not pass over a qualified disabled employee for reassignment because it prefers another candidate. Second, the fact that Defendant's currently claimed reason (lifting) for not reassigning Mr. Hayes to the position is different than its previously claimed reason (experience) supports a finding of pretext and discrimination.

The obligation to reassign a disabled employee is "more than merely allowing a disabled person to compete equally with the rest of the world for a vacant position." *Smith,* 180 F.3d at 1165. If it is determined that reassignment is reasonable, "then the disabled employee has a right in fact to reassignment, and not just to the consideration process leading up to the potential reassignment." *Id.* at 1166. The Supreme Court has acknowledged that preferences will sometimes prove necessary to achieve the ADA's

basic equal opportunity goal. *U.S. Airways v. Barnett*, 122 S. Ct. 1516 (2002). Thus, "a disabled employee who is qualified for a vacant position is _entitled to reassignment even though he may not be able to establish that he is the most qualified person_ whom the employer could have selected." *Hall v. Claussen,* 6 Fed.Appx. 655, 668, 2001 WL 219088, at *7 (C.A.10 (Colo.),2001) (Citing *Smith*).

Defendant's documentation states that Mr. Hayes was not selected, not due to his lifting restriction, but because another applicant was preferred. (Ex. 34). This constitutes a violation of its reassignment obligations under the ADA. *Id.*

Additionally, the glaring inconsistency between Defendant's argument that he was not selected due to a lifting restriction and its documentation that it was due to preference for another applicant supports an inference of pretext. *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (C.A.10 (Okl.),1997) . This inference is bolstered by the fact that lifting is not listed on the job description. *Id.* Thus, the jury could infer that Defendant failed to place Mr. Hayes in the parts supervisor position for discriminatory reasons, and summary judgment is inappropriate.

### 2. *Mr. Hayes was Qualified for the Colorado Springs Shift Manager Position.*

Prior to taking medical leave in 2014, Mr. Hayes had worked for Defendant as a shift manager in Denver. (Ex. 3). Defendant concedes that he was exceptional in that capacity, and offers no argument that he would not have excelled in the same role in Colorado Springs, had it been made available to him. It is undisputed that on October 30, 2014, Mr. Hayes directly contacted Ms. Roberts and told her that he was seeking

reassignment to this position, but she did nothing to assist him in obtaining that job. (Pl. Fact No. 28).

Defendant argues that it was not required to place Mr. Hayes in the Colorado Springs shift manager position because it was postponed and not filled, allegedly because it had lost its contract with United.

Defendant's argument is a fabrication. Ms. Hancock explicitly testified that the Colorado Springs shift manager position was filled, and that when it was, Defendant took no action to place Mr. Hayes in that role. *Id.* She testified that Defendant failed to reassign Mr. Hayes, despite Defendant's understanding that it was required by the ADA to do so. *Id.*

Further, Defendant's claim that the Colorado Springs shift manager position was postponed because of the cancellation of the United contract is demonstrably false. The contract was cancelled for *Denver* operations, not for Colorado Springs. (Exhibits 39, 32). The fact that Mr. Hayes was able to apply for the Colorado Springs position on October 30, 2014, six weeks after the United contract for Denver was cancelled, conclusively disproves Defendant's claim. *Id.* Additionally, Defendant did not contact Mr. Hayes until January 15 to claim that the position had been postponed, indicating that for 2.5 months after his application the position was open and unfilled. (Ex. 33).

Defendant's failure to place Mr. Hayes in the open shift manager position was in violation of its duty under the ADA to reassign him to an open position for which he was qualified. *Smith*, 180 F. 3d 1154. Its demonstrably false justifications for that failure

support an inference of pretext, precluding summary judgment. *Morgan*, 108 F.3d at 1323.

### 3.  Mr. Hayes was Qualified for the Denver Pilot Recruiter Position.

#### a.  Mr. Hayes was Entitled to Reassignment to the Denver Pilot Recruiter Position.

Prior to working for Defendant, Mr. Hayes had 8 years of recruiting experience. (Ex. 3 at p.001090). Defendant claims to have offered him a pilot recruiter position, and, according to Ms. Roberts, it would not have done so unless he was qualified. (Pl. Fact No. 18). Because of his qualifications for the position, under Defendant's policies, he should have been placed in the pilot recruiter position in order to comply with the ADA. (Pl. Fact No. 19).

Assuming that the position sought is not a promotion, employers have an obligation under the ADA to reasonably accommodate by reassigning employees to open positions for which they are qualified. *Smith,* 180 F.3d at 1161.

Defendant first claims that it did not have to accommodate Mr. Hayes by reassigning him to the Denver pilot recruiter position because he was not qualified due to arrogance. But this claim is flatly contradicted by Defendant's glowing performance reviews of him, praising his "strong connection" to his co-workers and his "professional and diplomatic approach." (Ex. 1 at pp.1-2). Moreover, Ms. Roberts testified that Mr. Hayes was qualified to be a recruiter, as evidenced by the fact that Defendant claims that he was offered a pilot recruiter position in Salt Lake City. (Pl. Fact No. 18). Mr. Hayes has therefore demonstrated that Defendant's arrogance claim is pretext, and is entitled to proceed. *Morgan*, 108 F.3d at 1323.

Defendant next claims that it attempted to accommodate Mr. Hayes by offering him the Salt Lake rather than the Denver pilot recruiter position. But Mr. Hayes explicitly testified that he was never offered the position. (Resp. to Def. Fact Nos. 34-35). Moreover, Defendant cites no case holding that an employer may fulfill its reasonable accommodation obligations under the ADA by reassigning disabled employees to out-of-state positions. "Everything that an employer must do in terms of a reassignment is modified by the adjective *reasonable*…" *Smith*,180 F.3d at 1171 (emphasis added). Given that an identical position in Denver was available, requiring Mr. Hayes to transfer to Utah to remain employed was not reasonable.

Anticipating that it failed to reasonably accommodate Mr. Hayes through the Denver pilot recruiter position, Defendant argues in the alternative that it was not required to reassign him as a pilot recruiter because the position constituted a promotion. However, Ms. Hancock stated that she could not say that pilot recruiter is any higher a position than ramp agent. (Resp. to Def. Fact No. 31). Additionally, *Smith,* 180 F.3d at 1176-77, holds that the ADA is not a mechanism for career advancement. Here however, Plaintiff had already been a supervisor for Defendant, but voluntarily stepped down in 2013 due to his health. (Ex. 6). Defendant points to no evidence that the pilot recruiter position was any higher than the supervisor position that Mr. Hayes had held before his health deteriorated. At most, he was seeking the pilot recruiter position in order to return to a level that he had achieved before his health declined. He was not using the ADA to advance his career, but to return to a level he had previously attained based on merit. (Ex. 1). *Smith* is therefore not applicable.

23

b.  Mr. Hayes was Discriminated Against in Favor of a Less
Qualified Applicant.

Assuming that the pilot recruiter position was a promotion, Defendant was

nevertheless required not to discriminate against Mr. Hayes in favor of a less qualified

applicant. *Rakity v. Dillon Companies, Inc.,* 302 F.3d 1152, 1164 (C.A.10 (Colo.),2002).

If Mr. Hayes produces evidence that Defendant's justification for passing over Mr.

Hayes in favor of another applicant is false, "the trier of fact can reasonably infer from

the falsity of the explanation that the employer is dissembling to cover up a

discriminatory purpose." *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 134,

(2000).

Defendant claims to have selected a "more experienced" candidate than Mr.

Hayes for the Denver pilot recruiter position. However, Mr. Hayes had 8 years of

recruiter experience, the person selected had none. (Exhibits 27; 3 at p.1090). Mr.

Hayes had 8 years working for Defendant—including three promotions—the person

selected had one year of part-time work. *Id.* Based on this evidence, the jury could

reasonably conclude that Defendant claimed reason for not selecting Mr. Hayes—the

availability of a "more experienced" candidate—was pretext for discrimination. *Reeves*,

530 U.S. at 134.

Defendant claims that the recruiter could not have discriminated against Mr.

Hayes because she did not know he was disabled. However, on his pilot recruiter job

application, he referred to his kidney disease and lifting restriction, as well as the fact

that he had previously been fired for his disability. (Ex. 3). Further, the day Mr. Hayes

applied for the position, Ms. Roberts contacted the recruiter, and informed her of his

medical leave. (Defendant's. Dep. Ex. 55). Based on this evidence the jury could reasonably infer that his disability was known to the decision maker, and a motivating factor in her decision.

Finally, Defendant admits that not placing Mr. Hayes in the pilot recruiter position was in violation of its own policies, which require a qualified disabled applicant to receive priority regardless of whether there is a more qualified applicant available. (Pl. Fact No. 19). Because an employer's failure to follow its own policies can support an inference of pretext and discrimination, *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1119 (10th Cir. 2007), Plaintiff is entitled to proceed.

### 4.  Mr. Hayes was Qualified to Work as a CST.

Plaintiff received glowing reviews for his work as a CST, and the position description does not list lifting as a requirement. Plaintiff was therefore qualified to work as a CST. Thus, Defendant was required under the ADA to reinstate him in that position if it was open. *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1272 (C.A.10 (Kan.),1998)

Defendant concedes Mr. Hayes' qualifications but claims in a conclusory affidavit that there were no CST positions in Denver "from July-December 2014." (Def. Ex. C, ¶4). However, in May 2014 Plaintiff had been given a CST job description by Defendant reflecting the duties of his position. (Ex. 8). In August, his supervisor signed an accommodation form that identified him as a CST. She also stated in August that "he really only does [C]ST training." Another supervisor told him that when he returned from surgery in August it was as a CST. And in all of his correspondence from that time he identified himself as a CST. (Resp. to Def. Fact Nos. 14-15). Based on this evidence, a

jury could reasonably conclude that Plaintiff was a CST. Thus, Plaintiff is entitled to proceed based on Defendant's failure to allow him to return to that position following his medical leave. *Aldrich*, 146 F.3d at 1272.

Once a plaintiff establishes qualification for an open position, to establish that an accommodation is not required, an employer must present evidence of undue hardship requiring significant difficulty or expense. 42 U.S.C.A. §§ 12112(b)(5)(A); 12111.

Defendant concedes that Mr. Hayes' return to work in August 2014 was incident free, and that it experienced no hardship. (Pl. Fact No. 10). It concedes that it could have allowed him to continue to work as a trainer by simply re-writing his position description, and that doing so would have posed no difficulty for its operations whatsoever. (Pl. Fact Nos. 10, 11, 13, 14). It has therefore failed to meet its burden to establish undue hardship.

Instead, Defendant argues that it had no need for trainers in Denver beginning on September 30, 2014, because of the cancellation of its contract with United. However, this does not establish a justification for its dismissal of him in August. At most, Defendant's argument addresses damages, not liability. What is more, as discussed above, the cancellation of the contract with United could not have been the motivation for Defendant's actions, because the contract was not cancelled at the time that Defendant dismissed Mr. Hayes from his duties as a CST. (Resp. to Def. Fact No. 29).

Plaintiff is entitled to proceed based on Defendant's failure to allow him to continue to work as a CST, an open position for which he was qualified. *Aldrich*, 146 F.3d at 1272.

### 5.  Mr. Hayes was Qualified to Work as a Ramp Agent

The ADA's essential functions inquiry focuses initially "on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." *Id.* (citing 29 C.F.R. 1630.2(n)(3)). Numerous factors are considered in determining whether a function is essential or not. These include the consequences of not requiring the employee to perform the function and the amount of time spent on the function. 29 C.F.R. 1630.2(n)(3).

Although written job descriptions are some evidence of what the essential functions of the job are, "such evidence is not conclusive; an employer may not turn every condition of employment which it elects to adopt into…an essential job function, merely by including it in a job description." *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1191 (C.A.10 (Utah),2003). Lifting requirements contained in written job descriptions are not necessarily essential job functions, and do not constitute a basis for summary judgment, when contradicted by an employee's testimony that lifting was not actually required on the job. *Exby-Stolley v. Board of County Commissioners*, 2015 WL 1326324, at *5 (D.Colo., 2015); *Harris v. Sweetwater County Sch. Dist. No. 2*, 113 F.3d. 1246 (10th Cir. 1997); *White*, 45 F.3d at 361.

Relying exclusively on the written position description and a one word deposition answer from Ms. Roberts, Defendant contends that in 2014 Mr. Hayes was not qualified to work as a ramp agent because lifting over 60 pounds was an essential function of the position. (Def. Fact Nos. 3, 24). However, neither the written position description, nor the conclusory deposition answer are conclusive. *Davidson*, 337 F.3d at 1191.

Contradicting Defendant's assertion that lifting more than 60 pounds was an essential function of Mr. Hayes position was the statement of his supervisor that all he did was training. (Ex. 16). After engaging in the interactive process, she also signed his accommodation form approving his return to work with the lifting restriction, which was consistent with his testimony that he wasn't required to lift. (Pl. Fact Nos. 8, 9, 16). Defendant admits that at the time it put Mr. Hayes on leave, it did not actually know if he was required to lift, and that it could have accommodated him by simply re-writing his position description. (Pl. Fact Nos. 13-14). These facts show that lifting was not actually required of Mr. Hayes, and therefore was not an essential function of his position. 29 C.F.R. 1630.2(n)(3).

In addition, Defendant admits that it suffered no adverse consequences from Mr. Hayes returning to work in August 2014 with his lifting restriction. (Pl. Fact No. 10). This further establishes that lifting was not an essential function. C.F.R. 1630.2(n)(3). He also identified numerous important roles that he could have filled as a ramp agent (lavatory service, push back, commissary, equipment distribution) without lifting. (Resp. to Def. Fact No. 24). His detailed testimony on this question—which includes far more analysis than Defendant has offered— precludes summary judgment, even though it is contrary to Defendant's written position description. *Exby-Stolley*, 2015 WL 1326324, at *5; *Harris*, 1113 F..3d 1246.

C.  Defendant Took Adverse Action Against Mr. Hayes.

An adverse action is one that a reasonable employee would find to be adverse. *Burlington Northern v. White*, 548 U.S. 53 (2006). Placing an employee on involuntary

leave is an adverse action under the ADA. 29 C.F.R. § 1630.2(l)(1); *Aldrich*, 146 F.3d at 1272; *Kulick v. Ethicon Endo-Surgery, Inc.*, 803 F.Supp.2d 781, 786 (S.D.Ohio,2011); *French v. Providence Everett Medical Center*, 2008 WL 4186538, at *4 (W.D.Wash.,2008) (citing *Burlington*); *Hepner v. Thomas Jefferson University Hospitals, Inc.*, 2013 WL 2334148, at *8 (E.D.Pa.,2013). Failure to reassign an employee is also adverse action. *See Hinson v. U.S.D. No. 500,* 187 F.Supp.2d 1297, 1310 (D.Kan.,2002).

Defendant contends that Mr. Hayes suffered no adverse action because he was placed on medical leave and because it supposedly endeavored to place him in another position. However, a reasonable employee would find unnecessary, unpaid, involuntary leave to be adverse. *Burlington*, 548 U.S. 53; *Aldrich*, 146 F.3d at 1272; *Kulick*, 803 F.Supp.2d 786. Ms. Roberts admitted during deposition that Mr. Hayes' leave was not a reasonable accommodation. (Pl. Fact No. 28). Additionally, Mr. Hayes has produced substantial evidence that Defendant failed to place him in several positions for which he was qualified. This is adverse action. *Hinson*, 187, F.Supp.2d at 1310.

Defendant also claims that Mr. Hayes was responsible for its failure to reassign him, allegedly because he did not seek a transfer. However, because it is not a small employer, it was incumbent on Defendant, not Mr. Hayes, to identify an appropriate position. *Smith*, 180 F.3d at 1173. Mr. Hayes made his desire for reassignment explicit, asking Ms. Roberts if there were "any other position," he could be placed in. (Resp. to Def. Fact No. 44). Yet Defendant still failed to reassign him to open positions for which he was qualified. That is adverse action. *Hinson*, 187, F.Supp.2d at 1310.

D.  Defendant Illegally Retaliated Against Mr. Hayes.

Within three weeks after he filed an EEOC charge, Defendant denied Mr. Hayes reassignment to the Denver pilot recruiter position. Three weeks after that, it denied him the parts supervisor and shift manager positions also. (Pl. Fact No. 30).

The ADA recognizes retaliation claims when an employer takes adverse action against an employee in retaliation for engaging in protected activity. *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007).

Mr. Hayes' filing an EEOC charge was protected activity. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (C.A.10 (Colo.),1999). As discussed above, Defendant's failure to reassign him was an adverse action. The only question that remains is causation.

"If the employee can show that the employer's proffered reason for taking adverse action is false, the factfinder could infer that the employer was lying to conceal its retaliatory motive. *Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1218 (C.A.10 (Colo.),2003) (citing *Reeves*).

Defendant claims that Mr. Hayes was unqualified for the pilot recruiter and parts supervisor positions, and that the shift manager position was not open. But Plaintiff has refuted each of these claims with admissible evidence sufficient to establish pretext and infer retaliatory motive. *Id*. Particularly troubling are Defendant's assertions both that he was unqualified to be a pilot recruiter, and that he was offered a pilot recruiter position. This is textbook pretext, and Mr. Hayes is entitled to proceed with his retaliation claim.

IV.    **DEFENDANT VIOLATED THE FMLA**

A.  Defendant Interfered with Mr. Hayes' Rights to Continued Insurance
    Coverage During Leave and Reinstatement After.

"Under the FMLA, an employer may not interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided under the FMLA'" *Metzler v.*

*Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (C.A.10 (Kan.),2006) (citing

29 U.S.C. 2615(a)(1)).

Among those rights protected from interference by the FMLA are the right to

continued insurance coverage during FMLA leave, 29 U.S.C. § 2614 (c)(1); 29 C.F.R. §

825.209, and reinstatement upon the conclusion of leave. 29 U.S.C. § 2614(a).

To establish a prima facie case for FMLA interference or entitlement, a plaintiff

must show that: (1) he or she was entitled to some right under the FMLA; (2) some

adverse action by the employer interfered with the employee's right; and (3) the

employer's action was related to the exercise or attempted exercise of his or her right.

A denial, interference, or restraint of FMLA rights is a violation regardless of an

employer's intent. *Metzler*, 464 F.3d at 1180.

Defendant clearly violated the FMLA by cancelling Mr. Hayes' health insurance in

July 2014 when he was on FMLA leave and recovering from surgery. The right to

maintain coverage during leave is explicit, 29 U.S.C. § 2614(c)(1), and Defendant

cancelled it nevertheless. Although Defendant's brief does not discuss this element of

Mr. Hayes' claim, it can be inferred that its defense is that he had exhausted his FMLA

leave. However, its documentation shows that Mr. Hayes had used less than his

statutorily mandated 12 weeks of leave at the time his insurance was cancelled. (Resp.

to Def. Fact No. 16). Defendant is therefore liable for interfering with his right to continued insurance coverage.

Defendant also interfered with Mr. Hayes' right to reinstatement at the conclusion of his FMLA leave. Because he had not exhausted his 12 weeks of leave, he was entitled to reinstatement when he was healthy enough to return to work. 29 C.F.R. § 825.216(c). But on August 20, 2014, after his incident-free return to work—which lasted only eight days—Defendant placed him on involuntary leave despite acknowledging that it could have allowed him to continue to work. (Pl. Fact Nos. 10, 11, 13, 14). Defendant's forced leave, merely one week after Mr. Hayes returned from medical leave constitutes an illegal interference with his right to reinstatement under the FMLA. *Metzler*, 464 F.3d at 1180; 29 U.S.C. § 2614(a).

B. Defendant Illegally Discriminated and Retaliated Against Mr. Hayes for Taking FMLA Leave.

The FMLA also prohibits any employer from retaliating or discriminating against any employee for the employee's use of the FMLA. 29 U.S.C. §§ 2615(a)(2) and 2617(a); 29 C.F.R. § 825.220. A prima facie case is established by a plaintiff if (1) he or she availed himself or herself of a protected right under the FMLA; (2) the employer took action that a reasonable employee would have found to be materially adverse; and (3) there is a causal connection between the two actions. *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117,1135 (10th Cir. 2003); *Metzler*, 464 F.3d at 1171.

A plaintiff's establishment of a prima facie case for retaliation gives rise to a presumption of illegality. *Morgan,* 108 F.3d at 1323. To rebut an employee's prima facie

case, an employer must produce evidence that the action alleged to have been materially adverse came about as the result of a legitimate reason. *Id*. Once an employer offers a legitimate reason, then the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual. *Id*. *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

Causation for FMLA claims is governed by the "motivating factor" standard. *Didier v. Abbott Laboratories*, 21 F.Supp.3d 1152, 1176 (D.Kan.,2014).

After Mr. Hayes took FMLA leave and complained about being discriminated against, he was passed over for the Denver pilot recruiter position, the parts supervisor position, and the Colorado Springs Shift Manager position. These events establish the elements of his prima facie case. *Khalik,* 671 F.3d 1188. Defendant claims to have legitimate reasons for each of these actions, but viewing the evidence in the light most favorable to Mr. Hayes supports a finding that he was the most qualified for the Denver pilot recruiter position, that lifting was not a qualification for the parts supervisor position, and that the shift manager position was opened and filled by someone else. Under the burden shifting framework, he produced evidence sufficient to support a finding of pretext, and is therefore entitled to proceed on his FMLA discrimination and retaliation claims. *Id.*

Defendant claims that there is insufficient temporal proximity to infer a causal connection between Mr. Hayes' leave and its adverse actions, arguing that he had exhausted his leave before it took the actions. However, the evidence demonstrates that Mr. Hayes never exhausted his FMLA leave, and he was on leave when Defendant

cancelled his insurance. When an employer takes adverse action against an employee who is on FMLA leave, causation is established. *DeFreitas v. Horizon Inv. Mgmt. Corp.,* 577 F.3d 1151, 1160 (10th Cir. 2009). Here, Defendant violated the law by cancelling his health insurance during his leave. This is more than temporal proximity, it is temporal identity, and it is sufficient to establish that Defendant's adverse actions were motivated by discriminatory and retaliatory animus. *Id.* Further, Defendant's failure to place Mr. Hayes in the Denver pilot recruiter, shift manager, and parts supervisor positions occurred only weeks after he returned from leave and complained of discrimination. (Pl. Fact No. 30). This is sufficient temporal proximity to establish causation. *Metzler*, 464 F.3d at 1172.

## CONCLUSION

Mr. Hayes has produced admissible evidence that he was qualified to work as a parts supervisor, shift manager, pilot recruiter, CST, and ramp agent. Defendant's reasons for not placing him in these positions—including undocumented lifting requirements, a "more experienced" candidate with significantly less experience, and *post hoc* justifications that contradict its own contemporaneous records—are pretextual. In addition, Defendant violated the FMLA by cancelling his insurance when he was on leave, and refusing to reinstate him despite an admitted lack of hardship. All of Defendant's adverse actions against Mr. Hayes took place either during or shortly after he took medical leave, requested accommodation, and filed an EEOC charge.

Mr. Hayes has presented evidence sufficient to demonstrate genuine issues of material fact for each of his claims. Defendant's motion must be denied in its entirety.

Respectfully submitted this 30th day of November, 2016.

s/ Paul Maxon
Paul Maxon (Atty. Reg. # 37251)
The Law Office of Paul Maxon, P.C.
4450 Arapahoe Avenue
Boulder, CO 80303
Telephone: (303) 473-9999
Fax: (303) 415-2500
E-mail: paulmaxon@maxonlaw.com
Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of November, 2016. I caused a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be electronically served via electronic mail to the following:

Vance O. Knapp
633 17th St. Suite 3000
Denver, C0 80202
(303) 297-2900
vknapp@shermanhoward.com
Attorney for Defendant

s/ Paul Maxon
Paul Maxon (Atty. Reg. # 37251)
The Law Office of Paul Maxon, P.C.
4450 Arapahoe Avenue
Boulder, CO 80303
Telephone: (303) 473-9999
Fax: (303) 415-2500
E-mail: paulmaxon@maxonlaw.com
Attorney for Plaintiff